We'll hear argument next in Case 12-3, Lawson v. Zang v. FMR LLC. Mr. Schnapper. Mr. Chief Justice, and may it please the Court, Section 1514a is written in the classic language which Congress utilizes to regulate relations between employees and their employers. Legislation regarding how an entity is to treat an employee is understood to refer to the entity's own employees. And that is particularly true here, where the phrase ''terms and conditions of employment'' is used in the statute. If Section 1514a forbade only contractors to retaliate against employees in the terms and conditions of their employment, I don't think there would be any question that the courts would understand it was referring to the contractor's own employees. The statute has the same — that language has the same meaning, even though it's The First Circuit's decision interpreting 1514a to permit a contractor to retaliate against its own employees is inconsistent with its general usage, and it leads to four implausible consequences. First, it renders the statutory language regarding contractors virtually meaningless. Secondly, it renders that language with regard to contractors in the mutual fund industry literally meaningless. Third, it has the implausible consequence of permitting the very type of retaliation that we know Congress was concerned about, retaliation by an accountant such as Arthur Anderson. And finally, it renders incoherent the provisions in 1514a and the related remedial provision regarding scienter, the burden of proof, and an affirmative defense. Is it your position that employees of any officer, employee, contractor, subcontractor, or agent of a public company are covered? They're all covered? I'm not — it's our position that employees of contractors and subcontractors are covered. All employees, or would you limit it to the ones that had a hand in executing the contract? We — if I understand the question correctly, we have not taken a position, and the standard we advanced does not address the question of a personal employee of an employee, such as Ken Lace Butler. That would raise distinct issues. Well, if it doesn't include that, then how do you avoid that with your reading of the text? Your Honor, our view of this is that the meaning of the term employee depends on the context in which it's used, and it ought to be assessed separately for each of the actors. So when it says no publicly traded company may retaliate against an employee, it means an employee of the publicly traded company. But — and the same thing with contractor and subcontractor. But if we had a statute which by itself said no employee of personal — no employee of an officer shall do something, the normal reading of that would be to refer to an employee of the officer's company. And we have statutes that impose personal liability on officials for things they're doing in their companies, and that's the way they read. So it's our view that — Well, that's sort of peculiar. I mean, I'm really — I don't see how you can piece it out like that, that it includes employees of contractor, subcontractors, but not of any officer. But let me ask you this. If it does include employees of an officer, is it as much of a disaster as your opponent suggests? That is to say, would a firing for something that had nothing to do with the securities laws be swept in? The statute forbids retaliation for protected activity related either to the securities law or to certain criminal fraud provisions. And that's quite deliberate. The statute — Sarbanes-Oxley is not limited to corporate misdeeds and related things. Title VIII and Title IX also deal specifically — deal much more broadly with criminal fraud. Title IX increases the penalty for wire fraud and mail fraud without regard to whether it has — it was by a corporation or an individual. So this is a less limited anti-fraud statute. But it is limited to those subjects. And is the personal employee of an officer likely to be involved with any of those subjects? No, Your Honor. They're unlikely to know of such things. But the Congress deliberately wrote the statute to deal with ordinary wire and mail fraud, not just corporate public company-related fraud. The statute is broader in that regard. Breyer. So what's the limitation? That is, if you — the argument against throwing the contractors in the way you want, I think is, well, then there's no limitation. So a company that, let's say, is a publicly traded company, lives in a — they have a building, and they hire a gardener. And the gardener is a gardening company, and it has three employees, and it works one day a week cutting their lawn, and it works four days a week cutting somebody else's lawn. And is the mail fraud? And then they fire one of the three employees or two. And he gets annoyed and says it was because of fraud. Now, the fraud has nothing to do with the company that they're cutting the lawn for. It has to do with some other customers. All right. So what — how do you — I don't think the statute intends to get that. I mean, does it want to make every mom-and-pop shop in the country, where they have one employee, suddenly subject to whistleblower protection for any fraud, even those frauds that have nothing to do with any publicly traded company? This is not really this case. But I'm trying to foresee, is it — are you arguing for no limitation or, you know, this — Well, I think there are two relevant limitations here, one of them statutory and one of them practical. The statutory one is that, although it wouldn't deal with, I think, the situation hypothesized, that the counterparty, so to speak, of the public company has to be — is described as a contractor. And we think that is not anyone who has ever had a contract with a public company. Contractor, in ordinary parlance, refers to an ongoing relationship. The paradigm is someone providing services on an ongoing basis, which, of course, fits lawyers and accountants perfectly. And so if someone from a private firm goes down to Wal-Mart, buys a box of rubber bands, that, in ordinary parlance, wouldn't be referred to as a contractor. So we think that as a practical matter, that rules out most mom-and-pop stores. They don't have that kind of relationship with people. Scalia. Of course, it also rules out the accounting firm that's only used once, right? Well, it would have to be very fast. I mean, I think an audit takes some time. But if you had someone come in for the first time. Well, you just hire them for this one audit. Are they a contractor? Well, I think an audit takes long enough that they would be. It's not like the moments that it takes to buy something at the gift shop downstairs. I think it typically takes weeks, if not months. And I think in ordinary parlance, you would call someone a contractor in those circumstances. Could you limit it as also ruling out frauds by companies that are not publicly traded themselves, of course, but where the fraud has nothing to do with the contract? That is, the whole activity just has nothing to do with the contract. It's just chance that they happen to have a contract somewhere. That's the way that Congress wrote the statute, and we think for two kinds of reasons. First of all, that the statute is also about, as you put it, garden variety fraud. It's increased the penalty for wire fraud, for mail fraud. For the first time, there's a provision for attempts and conspiracy. It is an anti-fraud statute in addition to dealing with the Enron issues. So we think that's deliberate. Secondly, Your Honor, although I'm not sure. Scalia does that mean yes or no to his question? I'd have to remember the exact question. Can you rule out frauds where the fraud is at issue? No. It has absolutely nothing to do with the contract. The statute isn't written that way. It isn't written that way. But, Mr. Caput, that's the position that the SEC took in its amicus brief to the First Circuit. It said section 806 applies where employees of the contractor are reporting possible violations of law by the public company for which the contractor is performing work. So it did put a limitation on of the kind that Justice Breyer has suggested. In other words, yes, employees of the contractor, but only when the employees are engaged, you know, only when the violations of law that the employee is reporting relates to the work that the contractor is doing for the publicly held company. Do you think that that's a possible reading of the statute or not? It's certainly possible. We think it's not the correct reading. And there's a – I think I'm – it's a possible reading, but we think it's not the correct reasons. So you're rejecting the district court's limitation as well? Yes, we are. Why is it a possible reading? Well, I guess it makes a lot of sense. I agree with that. I'm not sure I want to go down that road. That's not our view. I don't want to fight with the government. I suppose that the – I suppose that the – Justice Breyer. The road is when you see a statute that says any policeman, they don't mean a policeman on Mars, nor are they likely to mean a policeman in Europe. The any policeman is likely, although it says any policeman, to mean policeman in the United States. And similarly, where they talk about this, the contractors, they don't mean frauds related to – you have to use some kind of scope for the word – for the kinds of frauds that are included in the statute, and you have to read that in to language that says nothing about it. And that's – I don't say that that's necessarily easy to do, and that's why I started with my first question. As I said, we think that's – we think that's not the correct reading of the statute for a couple of reasons. Another one is that we think that unlikely – I mean, over and above the fact that Congress was concerned with fraud generally, the – was that I think Congress would have been reluctant to try to define what was sufficiently related to the corporation. And to go back to Justice Breyer's hypothetical, which gets at this point where you have the gardening – the gardening company privately held that's working for a public company, and there's some kind of an employee of the subcontractor is fired and claims that the company is engaging in some kind of fraud that has nothing to do with the public company. So you have that situation. Now you have the identical, another privately held gardening company, exactly the same thing is going on, except they don't have a contract with a public company. Why would Congress have wanted to cover the former and not the latter? Verrilli, I think that's just the way they wrote the statute. They were concerned with all fraud, but they didn't extend the whistleblowers to all fraud. But why? If they're concerned with all fraud, why not cover them both? Well, this is sort of a hybrid piece of legislation dealing with corporate problems and fraud, and they kind of melded the two here. But I think there are – it's also important in this situation to bear in mind the following point. I think Congress would have – was – it didn't itself draw a line because the experience of the Enron scandal was that all sorts of terribly complicated arrangements had been drawn up between Enron and these hundreds of off-the-books entities, Jedi, Raptors, LJM, and the like. I think Congress correctly concluded that if it tried to write out a description of what else it was covering, someone would think of a way to get around it. And I think it certainly wouldn't have contemplated that Federal courts were to try to untangle these relationships to the point where they could figure out whether, for example, if Andrew Fastow was skimming off money from Chucco, whether that would be sufficiently related to Enron. It's just – it's enormously complicated, and I think Congress didn't mean to open the door to that. The – and that's brought home by the fact that this statute is written more broadly than Air 21. The statute modeled on Air 21, which is a statute adopted a couple of years earlier about whistleblowing in the airline industry, particularly with regard to safety work. In that statute, contractor is specifically defined to mean an airline contractor dealing with safety. They did not put that kind of limitation here. And I think it – in part because it would simply have been very difficult to do. And I don't think they meant to give the courts permission to try to sort that sort of thing out. The core problem with the – with the interpretation of the court of appeals is that it really renders almost meaningless the decision of Congress to prohibit retaliation by contractors and subcontractors. Contractors and subcontractors would rarely be in a position to engage in retaliation, but particularly to engage in the very specific kind of retaliation specified in the statute, retaliation in the terms and conditions of employment. Kennedy. Kennedy. Is one of the limitations in the statute where it says in sub 1 to provide information relating to fraud against shareholders, do you think shareholders mean just the shareholders of the public company, or does it mean shareholders of the – suppose you have an accountant which is – has shareholders in it, and there is a fraud with the accounting firm, and it hurts the shareholders of the accounting firm, but not the company that's registered, does the – does the shareholder apply just to the publicly registered company? I would think so, Your Honor, but that's the case. You would think so? I think so. But this clause is an alternative. It may – a report would be protected if it involves a violation of 1341 or 134348, which aren't limited to shareholders. The words of the clause are not limited to shareholders. So fraud against shareholders just modifies the last clause or any provision of Federal law? Yes, it just modifies the last clause, exactly. With all the Court's permission, I would like to reserve the balance of my time. Thank you, counsel. Ms. Zaharsky. Mr. Chief Justice, and may it please the Court, the statute protects an employee of a contractor from retaliation. That's what the text says. That's what Congress intended to cover, these accountants, lawyers, and outside auditors who are so central to the fall of Enron. I'd like to go right to some of the questions that the Court had about the limits of the statute and how it would be applied. Now, of course, what we're talking about here is really the core of the statute, a contractor retaliating against its own employees. And we think that when the First Circuit said that that is unambiguously not covered by the statute, that it's wrong. But moving beyond that, assuming that that is covered and asking some of these questions or answering some of these questions about the limit, first of all, as Justice Sotomayor said, it's very unlikely that individuals who are in a position who have information about fraud or securities law violations are in a position to report it. So it is very unlikely that that would be the gardener. It's incredibly likely that it would be an accountant or auditor, like a person who worked for Arthur Anderson. Another one. Alitoso It's not unlikely that an employee of a subcontractor will have information about something that can be categorized, that can be alleged to be mail fraud by that by the contractor. That's not at all unlikely. You see, if you see some civil RICO complaints, you see the kind of things that are alleged as mail fraud. Do you disagree with that? Saharsky No, but I think it raises, your question raises a limit, another limitation on the statute, which is when the statute talks about contractors and subcontractors, it's contractor of a public company, so that it's talking about the contractor working in its capacity for the public company, not the contractor doing some other type of work. So if the contractor's work is for the public company and there is fraud being committed by the contractor, yes, that is something that Congress was concerned about. It was concerned about the fact that Arthur Anderson was committing fraud. Alitoso But you think this is limited to fraud by the contractor relating to the public company, not fraud that has nothing to do with the public company? Saharsky I think that it can be fraud by the contractor while the contractor is fulfilling its role as a contractor for the public company, not the contractor doing some other type of task. Alitoso In that capacity, in that capacity. Alitoso And where do you see that in the statute? Saharsky Of such company. The words contractor and subcontractor of such company. Now, it's a. Alitoso It says the contractor of such company, not the fraud of such company. Saharsky Right, but we think that when you are reading the statute holistically that that's the most natural reading. Now, I point out here that these are not questions at the courts of appeals or the court which is in the middle. Breyer The argument, the reason that I brought this up is because I think that the is that they fear that otherwise this statute would create any fraud by any gardener, any cook, anybody that had one employee in the entire United States and engaged in any alleged fraud would be covered. But it seems to me there are many ways to skin that cat. And one way that I suggested, now, Mr. Schnepper said, no, that kind of thing related to the contract isn't going to work very well because it's too complicated to try to figure out. So maybe we don't have to figure it out in this case. I mean, that's possible. I just wanted a universe of possibilities. Saharsky Yes. I think this is a completely understandable concern that was raised by the First Circuit. I have several responses to it. First of all, I don't think you need to decide it in this case. It's, this is a fairly mainstream application. Second of all, this is the kind of thing that the expert agency should consider in the first instance. There have not been cases except for the Spinner case that really has, that really have considered these questions about contractors and subcontractors. In the history of this statute, there are only about 20 published cases that have ever reached the court. Kennedy You say this is a mainstream application. We still have to give a rule. Do we write in the opinion, this is a mainstream application case and, therefore, it is so confined? That doesn't make any sense. Saharsky No, Justice Kennedy. My suggestion was because the Court doesn't have to decide some of these more far-fetched applications of the statute in this case, that it should leave it to the expert agency in the first instance. Kennedy Well, that was your second point. Your first point was just talk about the mainstream in this case and leave other cases. But I don't see how you can do that and interpret the statute. That's what I'm asking. Your statutory interpretation rule to keep this to mainstream is what? Saharsky I'm sorry, I should be more clear. What we think that this Court should say is that the natural reading of this provision covers, protects employees of contractors. The First Circuit said that employees of contractors are not protected at all from  Kennedy I understand that. Saharsky And we think that that's wrong. So that would be step one. Kennedy And I think that's a plausible reading. I don't see how it's confined to so-called mainstream, which is what we're talking about. Saharsky What I was trying to suggest, Justice Kennedy, is that this is a contractor retaliating against its own employees, and it's within the work that the contractor is doing for the mutual fund. This is investment advising. This is the heart of what contractors of mutual funds do. Scalia I understand that, but I think you're – I don't agree with you that we don't have to get into these other situations, because to my mind, the principal argument made by the Respondent is if you read the statute literally the way you like, it covers a wide range of things that one would have no reason to believe Congress wanted to cover. And unless you come up with some limiting principle that eliminates that argument, I'm not inclined to go along with your broad interpretation of the statute. So I at least do have to grapple with whether there are limitations, with what is the central mainstream of the statute and what is outside the statute. Saharsky Right. And what we're saying is that there are several limitations. The first is that it has to be a person who is in a position to detect and report the types of fraud and securities violations that are included in the statute. Second, we think that the contractor of such company refers to the contractor in that role working for the public company. Third, the expert agency that has considered this question has looked at whether there would be a floodgates open and has concluded, and this is on page 166 of the Petition Appendix, that there are built-in limits so that there would not be those floodgates. And fourth, I can tell you as an empirical matter that no floodgates have been opened. The Department of Labor has consistently interpreted the statute this way. Since the beginning of SOX, and you'll find on OSHA's website that it's only 150 or maybe 200 complaints per year that are filed with the agency. Kagan Mr. Saharsky, if I can take you back to second, a contractor of such company, you're saying we can read that to impose a limitation, that it's not anything that the contractor does in any capacity for anybody, whether relating to the contract or not. We could instead read it as, you know, the contractor means the entity doing a particular contract for a particular public company. Is that correct? Do I get that? In other words, inherent in the word contractor or in the phrase contractor of such a company is a sort of status of a company, and that one should not read this statute as applying outside that particular status. Saharsky I think that that's right. And the only thing that I would add to that is that it could be fraud that's being reported, that the contractor is engaging in fraud in that contract, or that the public company is engaging in fraud. But Congress would have wanted both those covered. It was Arthur Anderson and Enron that were involved in the fraud. Scalia This is not the Petitioner's position, however. The Petitioner takes a broader interpretation, as I understood him. Saharsky That is my understanding as well. But I think on the main question that's raised by this case, which is whether contractors can ever be covered, and the First Circuit said that they can't, we're in complete agreement. I also want to point this Court to the Board's opinion in this case, which we think is entitled to Chevron deference. It's an exceptionally thorough opinion. Ginsburg But it came up. I mean, we are reviewing a decision of the Court of Appeals for the First Circuit. And this Spinner case from the ARB postdates, we have a district court, a court of appeals. Chevron didn't raise its head until after the First Circuit was through with the case. So how does Chevron come into this particular case? Saharsky It's because the agency has been given this authority, and the Court has faced cases before where it has afforded Chevron deference, even though that was not an issue considered by the Court of Appeals. I'd point the Court to INS v. Aguerre-Aguerre. It's the Congress has entrusted this expert agency with making decisions through formal adjudication. Roberts It's even though it delegated rulemaking authority to a different agency, right? Saharsky No. There is no rulemaking authority for this provision under 1514a delegated. Roberts And then why isn't it the SEC? Sorry. Roberts And the SEC has no rulemaking authority that would cover this provision? Saharsky Not for this provision. For other parts of SOX, yes, but the anti-retaliation provision in SOX, like about 20 other anti-retaliation provisions, is entirely handled by the Department of Labor, and it's entirely handled through formal adjudication. Roberts As I understand, the ARB's decisions, they said that they were bound by OSHA's interpretation, right? Saharsky They said that, but then they also cited civil interpretation. Roberts And OSHA made it quite clear in its interpretation that it, in its rule, that it had no authority to issue statutory interpretations. Saharsky It said that it was not providing an interpretation, but I want to make sure the Court realizes that there are many other things that the Spinner decision relied on. I'd point the Court to footnote 8, page 143 of the Board's decision, where it says, in addition to this regulation, we're relying on several of our prior decisions, many of which do not even cite the regulation, and our decades of experience in looking at similar statutes, like Air 21. So to think that how can you say that? Roberts So we should ignore the part where it said it's bound by OSHA's interpretation? Saharsky I don't think that the agency should be worse off, because everyone who has considered this question within the agency has come to the same conclusion over a period of a decade. Roberts Thank you, counsel. Mr. Perry. Perry Mr. Chief Justice, and may it please the Court. Justice Alito asked, why didn't Congress say all employer or no employers? There are approximately 40 whistleblower statutes on the books as of today, Your Honors, and more than 30 of them, in fact 36 of them, are phrased exactly that way. They say no employer may retaliate or any employer is prohibited from retaliating. This statute is not phrased that way. This statute, which Congress could have written that way, and Dodd-Frank 922 is written that way, this statute is written quite differently. This statute says no public company may retaliate, and then it has a subordinate clause. And the subordinate clause is what's at issue here that references officers, employees, contractors, subcontractors, and agents. Justice Alito also asked my friend Mr. Schnapper, do you contend that the same construction should be given to officers and to contractors, and he acknowledged that they have to say no, because the ARB has also said no. In other words, an employee, the phrase that we are construing at the bottom of all of this, these turtles, is different, they say, for officers and employees and agents, presumably, than for contractors and subcontractors. But that doesn't fit with the statute. It doesn't fit with the tools of statutory construction. And it doesn't fit with what Congress was trying to do here. This was the failure of Enron. This was a bankruptcy situation. Congress was acutely aware that corporate bankruptcies, failures, left victims high and dry. One of the other provisions in this title, section 803, specifically deals with the dischargeability of shareholder fraud debts in bankruptcy. And what the subordinate clause that added these corporate representatives does is make sure that if the employer, the public company, goes out of business the way Enron had just done, somebody is on the hook for the money damages that Congress authorized for these employees, like Sharon Watkins. It's a very simple regime to make sure that the victim, the whistleblower, is not left high and dry if the company that is, by hypothesis, riddled with fraud goes out of business. What happens if another Enron situation comes along and the corporation's accounting firm retaliates against an employee of the accounting firm because that employee wants to report illegal activity by the corporation? Justice Alito, the accounting firms are not covered by 806, and let me explain that. Accountants, accounting firms, and auditors are referenced by name 153 times in the Sarbanes-Oxley Act, including in section 802 in this title. It says no accountant shall shred documents. 806 doesn't refer to accountants anywhere. It refers to contractors. And nowhere in the legislature does it refer to contractors. Ginsburg. Can an accountant be a contractor? No, Your Honor, because the contractor that's being referred to here, there's nothing in the statute, nothing in the legislative history that suggests that an accountant is a contractor. And more importantly, the reason for this is that the whistleblower who is working for the accountant, you say there are separate provisions that deal with the accounting firm and the law firm, but the whistleblower who wants to disclose what's, what nefarious thing is going on, would have no protection against retaliation by the accounting firm or if it's a law firm, the law firm? Justice Ginsburg, that is the matter that the Congress left to the expert agencies. The accounting firms are regulated by section 105 and the PCAOB. The answer to my question is right. They wouldn't have. Whistleblower claim against the accounting firm or the law firm. To this day, the agencies have not written rules requiring that. They could, and I would refer the Court respectfully to section 501 dealing with securities analysts where Congress required the SEC to write a rule protecting whistleblowers at the investment banks that are securities analysts. So when Congress wanted to protect those people, what Congress did for the accountants and lawyers was not to protect whistleblowers, it imposed a mandate. Section 10A of the Exchange Act.  I'm sorry. You told me that Congress didn't provide for the whistleblower, but it allowed the agency to do so. Correct, Your Honor. Which agency? The SEC for the lawyers, that's section 307, and the PCAOB for the accountants, that's section 105, and section 10A of the Exchange Act, which is incorporated by reference, Your Honor. What about the ARB? The ARB is nowhere involved with lawyers or accountants, as this Court made clear in the PCAOB case. The Congress decided to put the entire accounting profession under the thumb of that new board. That is a purpose-built regulatory agency that regulates birth to death of the accounting industry. And if they want to protect whistleblowers or not protect whistleblowers, that is the board's business. Congress didn't do anything there. What Congress did in 806 was regulate the public companies and their employees. And we can see this. This tracks very clearly through the legislative history. Breyer. When you're going to go through this, I'd appreciate your telling me, in your opinion, what the statute says, taking the extraneous words out, is that no contractor of a publicly traded company may discharge, demote, et cetera, any employee because of his lawful act in reporting a fraud. That's what it says. So what did they have in mind? If they didn't have in mind forbidding any contractor of a publicly traded company from a contractor, you know, maybe there are limitations there, but a contractor from demoting an employee because of his lawful act reporting a fraud. I may answer that in two steps, Justice Breyer. First, with due respect, the Court inverted the statute. It actually says, no public company, comma, or any contractor, comma. I just eliminated the extraneous words. And instead of the word such, I put in what such refers to. It's not extraneous here because it is subordinating the contractors to the public employees. And what Congress — more importantly, second, what Congress is doing in this response to my friend's question, was this a meaningless act? If I could point the Court to the Calcunte case. The Calcunte case is an ARB decision from 2009. It's cited at page 16 of the government's brief. Here is a bankrupt company, and the estate brings in a workout firm, a privately held contractor, to wind down the affairs of the company. And this private contractor decides that there's a squeaky wheel employee within the legal department and fires her. And she sues, under section 806, both the estate of the bankrupt company, that is, the public company employer in the first primary clause of the statute, and the workout firm. The contract. Breyer. So all they're interested in here, you say, is this workout contractor, but not, for the record, a fund which has virtually no employees and does all its work, really, through investment advisors such as here. And you think Congress didn't want to include the investment advisor firing its whistleblower, even if it's directly related to the fraud, the fund, and everything else, but it did just want to include the people who are there because the contractor is a worker, a workout firm, and not the investment advisor. Now, all that's a conceivable reading, I agree. But what is it in the — that leads you to that conclusion, other than, you know. Three points here, Your Honor. First, when Congress wishes to reach investment advisors in SOX and elsewhere, it amends the Investment Company Act of 1940 and the Investment Advisors Act of 1940. And for this, I can point you to Dodd-Frank 922, the parallel whistleblower provision that my friends haven't talked about, but it's very important here because it does cover all employers. And when Congress covered all employers in Dodd-Frank, it amended the 1940 acts to make clear that investment advisors were included. And the SEC has issued its form, TCR, that applies to investment advisors. Congress didn't do any of that in Sarbanes-Oxley. Second, we know the very next Congress, after Sarbanes-Oxley, took up the Mutual Reform — Mutual Fund Reform Act, which would have amended Section 806 to include investment advisors, to do exactly what the Petitioners in this case say this statute did. Why would Congress have taken up the very next Congress, all the same members were still there, Senator Sarbanes was still there, taken up a bill to do that? It's sort of post-legislative history, which we usually don't pay attention to. The problem that I have is if the statute does not cover contractors, subcontractors firing of their own people, what coverage does it have? A subcontractor usually cannot fire somebody from the principal company that's traded on the exchange. Justice Scalia, it's not just firing. It's also harassing. It's also threatening. These are contractors who may not be working. I don't see how it can harass or threaten, either, if it's an employee of another company. Sure, Your Honor. That it has no power to fire. Your Honor, it can either have contractors that are in the operation, management consultants and others that are working side by side with public company employees who can make their lives difficult, who can make their lives intolerable, who can lead to a constructive discharge if it's bad enough. And this Court has said in the Title VII context that that kind of discrimination does not require a supervisory relationship. And these contractors, just like agents and officers and employees, may have that ability to affect the terms and conditions of the public company's employees. So it's not. But you're eliminating the principal contractors who might have that kind of power. You say they're not covered. The accountants and lawyers. Yeah, yeah, yeah. Absolutely. But, you know, if there are – I mean, they are not covered by – for their own employees. If they were to discriminate against a public company employee, the public company's employees are always protected. That is the subject of this statute, the employees of the public company. And let's look at the title. We know. Congress didn't leave a big mystery about who they were protecting here. Whistleblower protection for employees of publicly traded companies. That's what the Congress told us. Including by accountants and lawyers? Against the public company's employees, actually. I absolutely agree. How so? If accountants and lawyers are not – are not contractors? If I said that, I misspoke, Your Honor. I didn't say they weren't contractors. I said they weren't regulated as contractors here because they were specifically regulated as accountants elsewhere. If they fit within the statute. I understand that they're not regulated as contractors here, unless it means that contractor here does not include them. Let me – let me try to be much clearer. The government makes the point that this statute is written to cover Arthur Anderson. I can't agree with that. Arthur Anderson appears all over this statute, and there's two titles of this statute that deal with accountants. Arthur Anderson might be included here if it – if it discriminates against a client, an audit client's employee. That's – that's just a normal contracting or agency relationship. That's what Congress was dealing with. What's not covered is Arthur Anderson retaliating against its own employees. That is what Congress gave to the board to decide or for the lawyers to the SEC to decide. And again, I have to point the Court to Section 501, which ordered the SEC to make a rule protecting securities analysts. Apparently, that's not the view of the SEC because I think they are – they are represented by the government. And the SEC apparently takes the view that this provision does cover contractors, covers lawyers who couldn't be contractors, and accountants. Your Honor, they – they are defending the ARB's decision. I agree with that. The ARB's decision, however, is – all comes back to this procedural regulation that OSHA promulgated that they agree is not entitled to deference. So it's not a reasoned articulation of the government's position. It is rather a post hoc rationalization of what the OSHA said a long time ago. It's a lot like the dissent in the First Circuit. Your Honor, the dissent in the First Circuit, like the ARB, I agree, disassociates the statute, the language, and employee from its context, from its grammar, from its The Senate report, Your Honor, goes through six times to explain what is the problem being addressed. And the Congress says there is no current protection for employees of publicly traded companies. That's at page 18. So what does this legislation do? Section 806, it provides protection for employees of publicly traded companies. That's at page 19. You're right on that. I mean, it is correct that that's what they talk about. And so then that sends us on a search for limitation. You have one limitation. Your limitation says the person who is dismissed has to be an employee of the publicly traded company. Now, the government, and even your Mr. Schnapper has come up with accepting some limitations. There are possibly others. One would be on the nature of the contractor, which you want to do, but it would be somewhat broader than yours. Another possibly is on the nature of the fraud. Is it related to the contract? Another might be the one the district court proposed, and there could be others. So I think if you want to say anything about this, it seems to me that taking as given, I will for argument's sake anyway, say all the legislative history is about publicly traded companies, and I do look at it. But nonetheless, they did use this language and there are other possible limitations that would serve the same purpose. Then you say to that, saying yours is the best, what? Your Honor, first, the very need for this discussion about limitations, which is found nowhere in the statute and nowhere in the legislative history, is eliminated if the Court were to construe the statute, as Chief Judge Lynch and the majority did below, for a public company. But that itself is a big limitation. Exactly right. Well, it's the limitation that Congress put in the statute, Your Honor. If we go beyond that, it seems to me universally accepted by my friends on this side that some limitation is needed. It can't be every company with a contract for the public company, except that is what the ARB said a contractor is, okay? And it can't be every kind of misconduct, except that's what the ARB has said this statute covers. And I'll point to the Lockheed case, which has nothing to do with fraud against shareholders. This is a run-of-the-mill, adulterous affair by a gossip, office gossip in a supervisor that the person brings a lawsuit under Section 806 saying that is fraud because she submitted her expense account. So what we have is, Justice Breyer. 1343? As wire fraud, Your Honor, correct. Was that what the fraud was in this case? In the Lockheed case, correct. So, Justice Breyer, your gardener, your three-person gardener, there's a couple of problems with it. First, if the same gardening company works for Kenlay and for Enron, this goes back to Justice Alito's question, my friend's argument is they're covered when they work for Enron, but not covered when they work for Kenlay. That's a bizarre reading of this statute, okay? Second, they're covered under the all of the so-called limitations that have been offered if the junior gardener hears gossip that the senior gardener is having an affair and submitting false expense reports regarding the hotel receipts, that's the facts of the Lockheed case, and reports that to the middle gardener and nothing happens and then the junior gardener gets fired because the economy downturns or something. Well, that's an easy hypothetical. What about the butler, who does in fact hear all this information about a conspiracy and wire fraud? Your Honor, there are still the State law protections, of course, for public policy and other protections. There is the Dodd-Frank Act. We haven't talked about it enough. Dodd-Frank 922 came in 8 years later and said, Congress said, we think we need to do a written submission to the SEC under penalty of perjury and we're going to limit it to securities fraud. So if the butler learns that the boss is doing something untoward, the butler then can go to the SEC and make a complaint. If it pans out, he can even get a bounty under that program. And if he gets fired, he's completely protected, has reinstatement and back pay. Congress dealt with that. There is a gap of 8 years. We definitely acknowledge that. But Congress moves incrementally in this area. The Sarbanes-Oxley Act was the first major widespread corporate governance reform at the Federal level. And Congress didn't purport to do everything at once. It went a long way. It subjected every public company to these new things. But for my friends to suggest that they covered not just the 5,000 public companies, but all 6 million private companies, without ever mentioning the fact, without ever discussing it, without debating it, without acknowledging that that would be the most dramatic expansion of this statute that was already pretty dramatic to begin with, that barely passed as the Court referred to. Sotomayor So doesn't that drama reduce itself if we accept the government's limitation, that it has to do only with the fraud related to the public company? Because that was the center of this bill. What motivated this bill? Your Honor, I agree that would be a limitation. I don't agree that it's found in the language of the statute. I mean, as a defense lawyer, I would like that down the road. And the ARB in the Lockheed case didn't seem to suggest that there is any such limitation. The ARB simply said fraud. Mr. Schnapper, Petitioner's here, certainly took that position today. So it's every fraud of any sort by any company that has a contract. Sotomayor We're not being asked to give deference to the Petitioner. We're being asked to give deference to the government. That's why I pointed to the ARB's decision in Lockheed, Your Honor. And the language there is exceedingly sweeping. It rejected all limitations that were offered in that case. The government's so-called limitation is no limitation at all. It is simply anything that is fraudulent is covered according to the government. Breyer They didn't say that today. And if, in fact, the fraud is related to the contract or by certain kinds of contractors who do investment work, who do all kinds of important work for the company, why shouldn't it be covered? I mean, and the language, of course, does say what I read, as you agree, is a contractor. Justice Breyer, if I could return to the point of this discussion of limitations, which is fascinating, but we are having it for the first time in the Supreme Court of the United States. Congress never had this discussion. Congress never discussed limitations because Congress never contemplated covering private companies. Alito What the statute says is any conduct, any conduct which the employee reasonably believes constitutes a violation of section 1341, 43, 44, or 48, do you see in there any limitation that it says that the conduct has to be fraudulent conduct relating to the activities of the publicly held company? It is not in the terms of the statute, Your Honor. And as I said, that's the holding of the Lockheed case in the ARB, that there is no limitation. Scalia Very sensible limitation. Unfortunately, it's not there. Your Honor, that's the danger of moving beyond the text of the statute. If we, if we, if they won't admit, my friends won't admit that every contractor and every fraud is covered, but that is the import of their argument. We submit that that's not right, or at least that that decision, if it is right, should be made by the Congress or by an agency with rulemaking authority on the public record to take public responsibility for it. No such determination. Breyer So that, it may be that you have a good point, that it's the SEC we should refer to and not the Labor Department. But then, as was pointed out, fine, then you're going to have that rulemaking. And given their position here, it looks as if they will hold something you don't like. But what, so what are we supposed to do about that, in your opinion? Schnapper Your Honor, they have not had that rulemaking since this statute was enacted in 2002, and we don't know whether they will have that rulemaking. The Court's opportunity, and I would submit obligation respectfully, is to read the statute as it was passed by Congress. Scalia I assume you would say that that rulemaking would be ultra vires if it took the position that the government is taking here, right? Schnapper Your Honor, Ms. Zaharsky said that the SEC has no power to make rules under Section 806. I'm not going to quarrel with her on that. Scalia No, but even if they did and they came out with a rule that reads just the way the government presented it today, you would say that that is an unreasonable reading of the statute, wouldn't you? We would, but we would also have a rulemaking record and a cost-benefit analysis of the impact on private companies and the impact of unemployment and all of the things that agencies have to take into account when they make these determinations, none of which exists on this record. We simply have the ARB deciding 5,000, 6 million, good enough, let's move forward. And that is not, we submit, what Congress intended here. Congress did not intend for the ARB to be able to make that decision. Both of my friends here agree that our reading, the First Circuit's reading, is a plausible construction of the statute. There's no argument that it's unambiguous on their side, okay? So their argument must be that Congress intended not to be able to answer this question, not to know whether it's 5,000 public companies or 6 million private companies, and so they punted that to an unelected board of lawyers within the Labor Department. That is not plausible. Breyer. Why is it, just because we may have to get to this, I thought section 3A of Sarbanes-Oxley, that's what we found here, quote, "'The Securities and Exchange Commission shall promulgate such rules and regulations as may be necessary or appropriate in the public interest, or for the protection of investors, and in furtherance of this Act.'" So why doesn't that delegate right to the SEC the power to interpret the general provisions of the section 802? To be quite blunt, Justice Breyer, before the government's concession 20 minutes ago, I would have thought the same thing. Well, so, I mean, I don't know that we should interpret that provision, which no one's briefed, given on that basis. We can certainly say this, though. What we know is the SEC has not exercised its power under 3A or under 307 or under 501, also dealing with contractors of sorts, to provide for whistleblower protections. If it chooses to do so for in the future, then we would have a different lawsuit. What we have now, however, is the unadorned statute passed by Congress, which deals with public companies. We have the First Circuit, in an exhaustive opinion, construing it, again, using all of the ordinary tools of statutory construction, what this Court has directed the lower courts to do, to determine plausibly, as everyone agrees, plausibly that it only covers public companies. We have a reading, then, that gives meaning to every single word in the statute that is comprehensible, that fits the purpose of the statute. Remember, the overall purpose of the statute is disclosure by public companies. It's not protection of investors, as some, at times, have said. It is disclosures by public companies. Private companies make no disclosures. They are not governed by the securities laws. So that excluding private company employees makes perfect sense in that respect. Mutual funds, Mr. Schnapper, page 13 of his reply brief, says, well, the advisors make all the disclosures for the mutual funds. We had that argument, Your Honor, two years ago, just as Thomas wrote the opinion for the Court in the Janus case, which rejected that very argument and said the mutual fund and the advisor are separate companies. The mutual fund makes the disclosures. Congress has set up the mutual fund industry that way. The ICI's brief, in this case, explains very cogently, I believe, all of the separate protections, including the independent board of directors and the chief compliance officer mandated by the SEC's 40 Act regulations that protect the investors in mutual funds. So we have a coherent, on the First Circuit's side, a coherent reading of the statute that my friends admit is plausible, that gives meaning to every word in the statute, that fits exactly the title that Congress used. And the title is legislative language passed by Congress, signed by the President. It fits every word in the legislative history. It makes perfect sense. And it doesn't have any untoward results. We submit that's. Alito, they give employees two things. They give another defendant, which means another insurance policy. So, for example, if you sue the company, you get the E&O policy. If you sue the President at the same time, you get the D&O policy. So you get two separate insurance policies, which is more money, more availability. You get the personal liability. Officers hate to be sued, so do contractors. And if the public company goes out of business, you get that protection of monetary relief. Alito, my question wasn't clear. If you say that the employee is only the employee of the publicly held company and not the employee of the private, privately held subcontractor, then that, the only situation that's covered with respect to the contractor is this so-called axe-wielding specialist. You have the axe-wielding specialist. The real world is Calcunte. I gave you that case where that actually happened. Yeah, it can happen, but it's really very small, isn't it? Well, Your Honor, that was one of six cases the ARB decided under this statute in 2009. So that year, that was one-sixth of the cases. That's not — I mean, it happens, okay? And it is not — it is a conceivable scenario in many more things because, again, it's not limited to discharge. It's also threats and harassment. And we certainly can see situations where contractors, particularly those kinds of contractors like management consultants, photocopy vendors and so forth, are in the facility with the public company employees, can make their life miserable. And remember — I'm going to agree with my friend Mr. Schnapper on something. The Congress recognized that Enron was structured in a way to try to get the liability out of headquarters. They had all these subsidiaries. They had Chuko and Ponderosa and all this. And Congress recognized that corporations might try to avoid their liability. So by picking up officers, employees, contractors, subcontractors and agents, they were trying to make sure that if the company tried to lay off the responsibility on somebody else, they'd still get captured because when their employees were doing. They could have done that just under agency. Many employment laws, of course, speak only of officers, employees and agents. But many contracts disclaim agency. Disclaim agency. Breyer. Where did it come from? That is, where did the words contractor, some human being wrote them for the first time? You probably know who did and where and under what circumstances, what, what, you know. Who was it, counsel? Some of us are interested in that. At least I am. Justice Breyer, it appears that formulation appears for the first time. In the history of the United States Code in this law. I know. So who is the human being who wrote them and what did he have in mind or she? We know, we don't know the, I don't know the individual. We know, however, that there is a Senate report that accompanied that language when it was introduced. Let's go back to the hearings. I mean, there might have been hearings. The only hearing testimony was, for example, the National Whistleblower Center, one of the amici here said corporate insiders, publicly traded companies. There is nothing, there is, the word contractor specifically appears nowhere in the legislative history. In the entire legislative history of the Sovereign Executive Act, every hearing, every floor statement, every report, it nowhere appears. It came, the word contractor came from the Air 21 Act, but of course the Air 21 Act doesn't have officers, employees or agents. That is language from Title VII. But the language did talk about Arthur Anderson and Enron. It did, Your Honor. And as I said, 150 times accountants appear. If I could just finish with this point. The Senate report lists four examples of the so-called corporate code of silence. The Anderson partner, the Vincent and Elkins lawyer, the UBS securities analyst, and Sharon Watkins at Enron. Congress dealt with them in four different provisions, section 105 for the accountants, section 307 for the lawyers, section 501 for the securities analyst, and section 806 for the public company employee. And then, we haven't talked about this yet either, it added for good measure section 1107, which says whoever shall retaliate against anybody who provides information to a law enforcement officer, which includes the SEC, is subject to a criminal offense under Title XVIII. So we have this interlocking, connected, nested series of provisions that deals with each of the concerns identified by Congress in an industry-specific fashion. And at no point did Congress suggest, intimate, hint, that, oh, by regulating these things, the lawyers, the accountants, the securities analysts, and the public companies, that they also were going to sweep in 6 million private employers. And if a member of Congress, I would submit, had stood up on the floor and suggested that, it would have been met with debate, derision, and defeat. The First Circuit's judgment, Your Honor, should be affirmed. Thank you. Roberts. Thank you, counsel. Mr. Schnapper, you have 5 minutes left. Thank you, Your Honor. Let me begin by just referring the Court to some materials that might be relevant to some of the questions you asked. With regard to the SEC's view prior to this case coming to this Court, those views were expressed in a separate brief the SEC filed in the First Circuit, which is consistent with the government's approach here. But we know they don't have rulemaking authority in this area. I agree with that, but the question came up about what their views were. With regard to the suggestion earlier that the ARB has taken the position that every contract, every firm that has a contract with a public company is a contractor, actually in the Flesar case, which is mentioned in both the Respondent's brief and our yellow brief, the ARB took the opposite position and took a position I think consistent with the view we've advanced, which is not every contract renders you a contractor. With regard to Arthur Anderson, the discussion in the Senate report about why there's a need to deal with retaliation is repeatedly about Arthur Anderson. Many of the people who actually understood what was going on at Enron were Arthur Anderson employees, not most of the run-of-the-mill employees at Enron. And they were the ones who remained silent in the face of this very, very serious problem. With regard to the origins of this phrase contractor, my brother, Mr. Perry, was right. It comes from Air 21. The preliminary Air 21 regulations regarding what it means were issued prior to the adoption of SOX, and they said it included employers, employees of employers, which has remained the view of the agency throughout. My colleague, with regard to Air 21, the history here is, I think, important. This statute referred to air carriers and contractors and subcontractors. And the Court below assumed that that meant that employees of subcontractors and contractors were covered. The First Circuit's theory was that Congress meant to narrow the meaning of contractor employees because it added retaliation by officers and employees. And it seems to me that that is precisely the wrong conclusion. When Congress added to the entities that could not retaliate, when it rewrote Air 21 to add some other people that couldn't retaliate, it didn't mean to tacitly then eliminate the employees of contractors who were governed under Air 21. Finally, with regard to the question the Court has raised about whether it should explore the possibility of a limitation based on whether a contractor was acting as a contractor, we think it would probably not be prudent to take that on at this time for a couple of reasons. First of all, a fair amount of the work that was done by Arthur Anderson was not — that was relevant wasn't done for Enron. It was done for the off-the-books enterprises. They did $5.7 million of accounting work for JEDI, where the debts — one of the places where the debts were being hidden. So you'd get into that problem. Secondly, this provision is adopted against the background of a series of executive orders, most important of which is Executive Order 11246, about racial discrimination by Federal contractors. That executive order has always been understood to cover all the employees of the contractor not just the employees who are working on the government project. And I think that's an important part of the background here. Congress has not tried to — the executive branch hasn't limited that. And in the Civil Rights Restoration Act of about 1986, Congress rewrote Title VI and Title IX to have institution-wide application rather than to do little parts of it. This issue about what a contractor might be doing as a contractor hasn't been vetted in lower courts, and we think it would be not prudent to try to take that on here. Thank you very much. Thank you, counsel. The case is submitted.